# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# ELKINS

**MARSHA CARR-LAMBERT,**

    **Plaintiff and Counterclaim Defendant,**

**v.**

**GRANT COUNTY BOARD OF EDUCATION,**    Civil Action No. 2:09-CV-61
**DOTTIE RIGGLEMAN, in her individual capacity,**    (BAILEY)
**JOYCE RIGGLEMAN, in her individual capacity,**
**DAVID JONES, in his individual capacity,**

    **Defendants,**

**v.**

**DOTTIE RIGGLEMAN, individually and**
**as a MEMBER OF THE GRANT COUNTY BOARD OF EDUCATION,**

    **Defendant, Counterclaim Plaintiff**
    **and Third-Party Plaintiff,**

**v.**

**MARSHA CARR-LAMBERT, Individually,**

    **Counterclaim Defendant,**
**and**

**JERRY OURS, Individually,**

    **Third-Party Defendant.**

## ORDER GRANTING COUNTERCLAIM DEFENDANT AND THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The above-styled case is presently before the Court on counterclaim defendant and third-party defendant's Motions for Summary Judgment [Docs. 219 and 223], filed on May 19 and May 20, 2011, respectively. The counterclaim and third-party plaintiff's response

was filed on June 10, 2011, and the counterclaim and third-party defendants each filed a reply on June 20, 2011. The Court has reviewed the record, and finds that both the counterclaim defendant and third-party defendant's Motions for Summary Judgment [Docs. 219 and 223] should be **GRANTED.**

## I. Backround

In January of 2010, Dottie Riggleman ("Riggleman") filed a counterclaim against Marsha Carr-Lambert ("Carr-Lambert") and a third-party complaint against Jerry Ours. Dortha (Dottie) Riggleman and Jerry Ours ("Ours") were board members of the Grant County Board of Education ("GCBOE"), and Carr-Lambert was the superintendent from 1999 until 2009. The claim arises out of events that took place both before and after the board voted not to renew Carr-Lambert's contract for employment as superintendent of Grant County. Riggleman's counterclaim and third-party complaint centers around one count based on West Virginia Chapter 61, Article 5, Sections 27(b)(1) and 27(c)(1).

Section 27(b)(1) makes it unlawful to use "intimidation, physical force, harassment, or a fraudulent legal process or official proceeding, or to threaten or attempt to do so with the intent to impede or obstruct a public official or employee for the performance or nonperformance of an official duty." Section 27(c)(1) makes it unlawful for a person to ". . . cause injury or loss to person or property, or to threaten or attempt to do so, with the intent to: 1.) Retaliate against a public official or employee for the performance or nonperformance of an official duty. . .."

Riggleman contends that the actions of Carr-Lambert and Ours were blatant acts

of intimidation, harassment and retaliation against her for voting multiple times not to renew Carr-Lambert's employment as Grant County Superintendent. Riggleman further contends that the actions of Carr-Lambert and Ours were of a malicious purpose, in bad faith, and of a wanton or reckless manner thereby placing these actions outside the scope of employment; therefore, she argues that under § 29-12A-5(b) of the West Virginia Code[1], Carr-Lambert and Ours should not be entitled to immunity. Riggleman is claiming damage to her physical health[2], mental health, and her reputation as a result of the alleged harassment, intimidation, and retaliation.

In response, the counterclaim and third-party defendants contend that nearly all of the alleged acts took place while Carr-Lambert and Ours were performing their duties as Superintendent and Board of Education member, respectively, and therefore Riggleman is barred from bringing a claim against them as individuals. Furthermore, they claim Riggleman has not put forth any credible evidence creating a genuine issue of material fact necessary to overcome summary judgment.

---

[1]§ 29-12A-5(b) of the West Virginia Codes states that "An employee of a political subdivision is immune from liability unless one of the following applies: 1.) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities; 2.) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or 3.) Liability is expressly imposed upon the employee by a provision of this code."

[2]This courts recognizes that Riggleman had alleged other incidents and damages in an affidavit, but these will not be addressed in this order due to the Affidavit [Doc. 240] being rendered moot by the previous Order to Strike [Doc. 258].

## II. Undisputed Facts

1. In 2004, the Grant County Board of Education ("GCBOE") voted numerous times on renewing the employment contract of Carr-Lambert as Grant County Superintendent. She had held the position since 1999. After at least two votes against, Carr-Lambert was granted a contract extension by the GCBOE. GCBOE Minutes. January 29, 2004.

2. On December 9, 2008, the GCBOE held a meeting at which the board voted 3-2 against renewing Carr-Lambert's two-year contract. GCBOE Minutes. December 9, 2008.

3. On February 10, 2009, the GCBOE held a meeting at which the board voted 3-2 against renewing Carr-Lambert's contract for one year. GCBOE Minutes. February 10, 2009.

4. On February 24, 2009, Carr-Lambert, at the GCBOE meeting, informed the board that she would be requesting a complete and thorough ethics investigation of at least one board member, David Jones ("Jones"), concerning recusing himself from voting on any item associated with the superintendent due to his relationship in a legal matter presently publicized and ongoing in the courts. The Ethics Commission found no conflict or ethical violation by Jones. GCBOE Minutes. February 24, 2009; Advisory Opinion No. 2009-04. April 2, 2009.

5. In March of 2009, Mr. Ours attended a meeting organized by parents from Bayard, West Virginia, concerning issues related to parent concerns with the education at Bayard. Riggleman was not present at the meeting. Iman Dep. 92:11-16 and 34:14-

35:3. Riggleman Dep. 174:24-183:9.

6. In April of 2009, Ours attended a meeting organized by the parents at Union Education Complex. Ours left immediately after arriving due to the presence of two other board members, Kirk Wilson and Joyce Riggleman. Ours left because the West Virginia Sunshine Act prohibits members of a board of education from meeting in a group of three or more unless there is notification of the meeting. W. Va. Code § 6-9A-3 (1999). Joyce Riggleman Dep. 255:15-258:4. Iman Dep. 87:6-24.

7. On April 13, 2009, the GCBOE received a letter from its attorney discussing the interpretation of W. Va. Code § 18-4-1(a), which states that an outgoing superintendent is entitled to "a teaching position in the county for which he or she is qualified and has seniority." See: Letter from Attorney Howard Seufer. April 13, 2009.

8. On April 21, 2009, at a GCBOE meeting, Mr. Ours moved to have a vote taken on whether or not to add a vote to place Carr-Lambert as assistant superintendent to the new business for the board. The board voted 3-2 not to place this item as new business. GCBOE Minutes. April 21, 2009.

9. On April 21 or 25, 2009, at the GCBOE meeting, the board went into an executive session where Kirk Wilson proposed that the board vote 5-0 to hire Tina Edwards ("Edwards") as new Superintendent and then administratively place Carr-Lambert as the assistant superintendent. Wilson Dep. 131:22-132:15 and 93:16-95:16. Riggleman Dep. 295:5-22.

10. On April 25, 2009, the GCBOE voted to hire Edwards as superintendent effective July 1, 2009. The vote was 5-0 in favor of hiring Edwards. GCBOE Minutes. April

25, 2009.

11. In May of 2009, Ours attended a meeting at Union Education Complex that was hosted by parents. Issues concerning securing funding to fix the gym and locker room were discussed. Riggleman was not present. Iman Dep. 90:4-91:9. Riggleman Dep. 174:24-183:9.

12. On May 12, 2009, Ours received an email from GCBOE treasurer, Tony Oates ("Oates"). In the email Oates explained that the GCBOE could not approve the current version of Edwards' contract because it contained improper provisions concerning her benefits. *See*: Email from Oates to Ours. May 12, 2009. At a GCBOE meeting later in the day, the board voted 3-2 not to place Carr-Lambert as assistant superintendent. GCBOE Minutes. May 12, 2009.

13. During a GCBOE meeting on May 26, 2009, Ours refused to sign Edwards' contract for superintendent due to the reasons stated in the email from Oates. Another vote was held concerning placement of Carr-Lambert as assistant superintendent. The vote was 3-2 against placement. GCBOE Minutes. May 26, 2009.

14. At a GCBOE meeting on August 11, 2009, the board officially recognized, and subsequently posted the opening, for the position of Director of Human Resources, Secondary Curriculum, and School Improvement. GCBOE Minutes. August 11, 2009.

15. In August of 2009, the GCBOE received applications concerning the position posting from August 11. According to Edwards' testimony, they were collected by the GCBOE secretary, Sandy Hendrick. Edwards created a interview committee consisting of herself and four other administrative personnel. Edwards selected two

candidates to interview: Marsha Carr-Lambert and Randal Houk ("Houk"). Edwards Dep. 81:20-93:11.

16. On September 1, 2009, Edwards interviewed both candidates, Carr-Lambert and Houk, for the position as the Director of Human Resources, Secondary Curriculum, and School Improvement. Edwards Dep. 88:17-24.

17. During an executive session of a GCBOE meeting on September 8, 2009, Ours informed the board that they could not hire Houk because he had multiple felony convictions. Edwards Dep. 87:1-88:9. Edwards also tendered her letter of resignation at this meeting. *See:* Tina Edwards Resignation Letter. September 8, 2009.

### III. Summary Judgment Standard

Summary Judgment is deemed appropriate when, after examining all the pleadings, motion, and proper discovery materials before the court, there is "no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has clarified by stating that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." ***Anderson v. Liberty Lobby, Inc.*,** 477 U.S. 242, 247-48 (1986). "[T]he mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient" to establish the existence of a genuine issue of fact. *Id.* at 252. The Court also notes that "genuine issues of material fact cannot be based on mere speculation or the building of one

interference upon another." ***Barwick v. Celotex Corp.***, 736 F.2d 946, 963 (4th Cir. 1984).

Evidence supporting a claim in opposition of a summary judgment motion must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they could create fair doubt rather than encourage mere speculation. ***Panrell v. UMW,*** 872 F.Supp. 1502, (N.D. W.Va. 1995). The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of her pleadings, but must instead set forth specific facts illustrating genuine issues for trial. ***Celotex Corp. v. Catrell***, 477 U.S. 317, 322-24 (1986).

### IV. Discussion

The counterclaim plaintiff's claim centers around West Virginia Code § 61-5-27 in relevant part, sections (b)(1) and (c)(1) of the statute.

**(b)** Intimidation; harassment.

It is unlawful for a person to use intimidation, physical force, harassment or fraudulent legal process or official proceeding, or to threaten or attempt to do so, with the intent to:

**1.)** Impede or obstruct a public official or employee from performing his or her official duties. . ..

**(c)** retaliation.

**1.)** Retaliate against a public official or employee for the performance or nonperformance of an official duty. . ..

W. Va. Code § 61-5-27 (1999).

In ***Mangum v. Lambert***,183 W.Va. 184, 394 S.E.2d 879 (1990), the Court noted that

"the use of threats or force is not necessarily an essential element of the offense of obstruction of justice as defined in W. Va. Code, 61-5-27. The obstruction may be by other means." 183 W.Va. at 188, 394 S.E.2d at 883.

While the scope of the retaliation provision, W. Va. Code § 61-5-27(c), has not been discussed, the retaliation provision of the Civil Rights Act of 1964 has been discussed and ruled on by the Supreme Court. It has concluded that "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." ***Burlington N. and Santa Fe Ry. Co. v. White,*** 548 U.S. 53, 57 (2006). Furthermore, the Court went on to say that "the provision only covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." ***Id.*** Therefore, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." ***Id.*** This Court believes the reasonable worker standard used for the anti-retaliation statute of the Civil Rights Act of 1964 is also an appropriate standard to apply to retaliation claims under W. Va. Code § 61-5-27(c).

Employees of a political subdivision are immune from liability unless one of three exceptions takes place:

1. His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;

2. His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

3. Liability is expressly imposed upon the employee by a provision of this code.

9

W. Va. Code § 29-12A-5(b)(1-3) (1986).

As long as Carr-Lambert and Ours were acting in the scope of their employment, and not acting with a malicious purpose, in bad faith, or in a wanton or reckless manner, they will be immune from any liability of their actions. § 29-12A-5(b)(3) is not applicable to this case.

After consideration of the entire record, the Court finds that all the allegations against third-party defendant Ours were within the scope of employment, and were not of a malicious purpose, in bad faith, or in a wanton or reckless manner. With respect to the allegations against counterclaim defendant Carr-Lambert, the Court finds that all of the allegations except those that took place after the expiration of her employment as superintendent on June 30, 2009, to be within the scope of employment and not of a malicious purpose, in bad faith, or in a wanton or reckless manner.

### A. Contract Votes and Prepared Statements

Riggleman asserts that the fact that Carr-Lambert and Ours put Carr-Lambert's extension of her employment contract up for vote on multiple occasions, and that Ours read a statement in support of Carr-Lambert, resulted in harassment, intimidation, and/or retaliation. However, the record shows there were differences in the contracts that were voted upon, and it is within the scope of Ours' employment to put employment issues on the agenda. *See:* GCBOE Meeting Minutes. December 9, 2008; GCBOE Meeting Minutes. February 10, 2009. *See also: Expert Report of William Grizzell*. September 14, 2010. With respect to the statement in support of Carr-Lambert, Riggleman testified that Ours did not read the statement in order to hurt her. Riggleman Dep. 284:17-285:10 and 280:17-281:5. Riggleman has put forth no evidence that shows Carr-Lambert did this with

the intent to harass, intimidate, or retaliate against Riggleman.

## B. Entitlement of Teaching Position

Riggleman alleges that Carr-Lambert and Ours' interpretation of W. Va. Code § 18-4-1(a), which entitles an outgoing superintendent a teaching position in that district as long as they were not removed for just cause, was wrong, and that the discussion that took place concerning its interpretation can be inferred as a threat. The counterclaim and third-party defendants cite to two letters written by attorney Howard Seufer concerning the superintendent's right to a position of employment. *See:* Seufer, Howard. *Superintendent's Right to a position of Employment Upon Expiration of Her Term of Office.* April 13, 2009; Seufer, Howard. *Outgoing Superintendent's Entitlement to a "Teaching Position".* May 11, 2009. These memos show that the interpretation of § 18-4-1(a) is clearly up for debate, and therefore discussion of how to interpret it at the meeting was within the scope of employment. The Court does not doubt that the discussion may have been heated, but the counterclaim plaintiff puts forth no evidence of intent to harass, intimidate, or retaliate and instead offers only speculation and conclusory statements, which is not enough to defeat a motion for summary judgment.

## C. Letters Concerning Ethical Violations

Riggleman alleges that during the February 24, 2009, meeting of the GCBOE Carr-Lambert demanded an investigation into an alleged ethical violation relating to the decision not to renew her contract. The record contains a letter dated February 14, 2009, from Marsha Carr-Lambert to the West Virginia Ethics Commission. It concerns whether or not a GCBOE member has a conflict of interest in voting for or against the superintendent's new contract when his boss is filing an individual civil suit for damages and the board

11

member's action could be a basis for his continued employment.  *See:* Letter to West Virginia Ethics Commission.  February 14, 2009.  The circumstances in the letter deal with board member David Jones and his boss Robert Sisk[3].

Riggleman contends that this letter to the West Virginia Ethics Commission was based on the same theory that Carr-Lambert alleged against Riggleman in 2006.  Carr-Lambert, in a letter dated September 12, 2006, brought up the fact that a different ruling than the original that came out on August 15, 2006, had been received electronically though it was unsigned.  In this letter, the only reference to Riggleman is that she wrote a letter to Ms. Kirk, the legal counsel for the Ethics Commission, concerning interpretation.  The letter to the Ethics Commission goes on to say that the GCBOE will operate under the official ruling of August 15, 2006, until an official letter is signed and delivered by mail rescinding the first decision.  The second letter is dated September 21, 2007, and raises several incidents of potential conflicts of interest between Robert Sisk, Dottie Riggleman, Joyce Riggleman, and Tim Riggleman.  Tim Riggleman was employed by EWVCTC of which Robert Sisk was the director, and is the husband of Joyce Riggleman and the son of Dottie Riggleman.

The Court agrees with the counterclaim defendant's assertion that Riggleman presents no evidence that Carr-Lambert's letters were sent with the intent to intimidate, harass, or retaliate against Carr-Lambert.  As previously mentioned, speculation alone is not enough to defeat a motion for summary judgment.  Furthermore, Riggleman offers no

---

[3]Robert Sisk was the Director of South Branch Career and Technical Center (SBCTC), and was the Director of Eastern West Virginia Community Technical College (EWVCTC) at the time Carr-Lambert wrote the letter.  David Jones was an employee of Robert Sisk at EWVCTC.

evidence that ties the letters in 2006 and 2007, which concerned the Rigglemans, to the letter in 2009, which concerned Jones, and no evidence that they were sent with the intent to damage the reputation of or harass Dottie Riggleman. The questions posed by Carr-Lambert were legitimate and clearly within the scope of employment as superintendent of Grant County.

### D. Non-Board of Education Meetings

In March, April, and May of 2009, meetings were held in Bayard, WV and at the Union Education Complex. They were organized by parents for various reasons, and were not official GCBOE meetings. Riggleman contends that at all of these meetings, Ours attempted to damage her reputation. Riggleman offers no evidence that her reputation was damaged as a result of statements by Ours, or that it was his intent to do so. Riggleman cannot even show that her name was brought up by Ours. As noted above, speculation alone cannot create genuine issues of material fact, and therefore cannot defeat a summary judgment. *Barwick* at 963.

### E. Videotaping Board of Education Meetings

Riggleman further alleges that her reputation was damaged by Carr-Lambert videotaping every board meeting she attended when her contract expired on June 30, 2009, and, when she did not attend a meeting, of recruiting citizens to videotape the meetings. In her deposition, Riggleman acknowledged that the GCBOE had a policy permitting the use of videotaping. Riggleman Dep. 19:13-20. Permission from the Superintendent was required if any equipment needed to be set up, however no evidence has been admitted into the record that shows Carr-Lambert set up equipment. Both Jones

and Riggleman were aware that videotaping was allowed, and neither objected to it. Riggleman Dep. 197:21-27; 198:3-8; Jones Dep. 95:18-24. Riggleman offers no evidence to support her contention that the videotaping of the meetings was done by Carr-Lambert to intimidate, harass, or retaliate against her. Not one board member contested or objected to the videotaping, and Carr-Lambert was completely within her rights and within the policy of the GCBOE to film the meetings.

### F. Recruitment of Citizens to Harass Riggleman

Riggleman also alleges that Carr-Lambert and Ours recruited citizens to come to GCBOE meetings and harass the board by asking questions concerning the search for a new superintendent and the costs associated with those matters. The two citizens that Riggleman can remember by name were Angela Iman ("Iman") and Kenny Hawk ("Hawk"). Ms. Iman testified under oath that Ours did not recruit her to attend GCBOE meetings, and that she never spoke to Mr. Ours about Dottie Riggleman. Iman Dep.12:13-13:1. Riggleman testified that Iman and Hawk's questions did not prevent the GCBOE from conducting the business that it had planned to conduct at that given meeting. Riggleman Dep. 330:12-23. Riggleman puts forth no evidence that the questions asked by Iman and Hawk came from Ours or Carr-Lambert. Accordingly, this allegation must fail.

### G. Distributing Copies of Carr-Lambert's Lawsuit

Riggleman alleges that Carr-Lambert distributed copies of her lawsuit to people who attended a GCBOE board meeting in May of 2009. Riggleman claims this action was part of the totality of events that added up to intimidation, harassment, or retaliation, but she can offer no evidence that Carr-Lambert was the one who brought, distributed, or even knew about them. Riggleman testified that she did not see Carr-Lambert distribute them, and

that they did not know where they came from. Riggleman Dep. 207:7-9.

## H. Refusing to Sign Edwards' Contract

Riggleman alleges that Ours' refusing to sign Edwards' contract was done to intimidate, harass, or retaliate against her. However, Riggleman can point to no evidence showing this was Ours' intent. Riggleman testified that she did not know why Ours refused to sign Edwards' contract for becoming the new superintendent. Riggleman Dep. 304:17-23. Furthermore, Ours received an email from the GCBOE treasurer, Oates, on May 12, 2009, that explained that Edwards' contract in its current form could not be approved because it contains improper provisions. *RE: Tina L. Edwards' Contract.* Email to Jerry Ours from Tony Oates. May 12, 2009. Therefore, Ours had legitimate reasoning not to approve the contract, and no evidence has been put forth by Riggleman that shows Ours' decision was outside of the scope of this assignment or in bad faith.

## I. Carr-Lambert as Assistant Superintendent

Riggleman further alleges that defendant Ours, at a March or April GCBOE meeting, attempted to coerce Riggleman and the other board members into selecting Carr-Lambert as the assistant superintendent by insisting he would vote for Edwards for superintendent only if Carr-Lambert was selected as assistant superintendent. As evidence, Riggleman points to a time line of notes created by Tina Edwards, however nothing in the time line says or implies that Ours was trying to intimidate or harass Riggleman into agreeing to this plan. *Tina Edwards' Time Line of her Notes*. April 25-September 8, 2009. Furthermore, according to testimony from GCBOE board member Kirk Wilson, it was he who crafted the idea to unanimously elect Edwards and then have Carr-Lambert appointed as assistant superintendent. Wilson Dep. 131:22-132-15 and 93:16-95:16. Riggleman testified that she

had no reason to disagree with Mr. Wilson's testimony, and when asked if she was intimidated by Mr. Ours because of this, she simply said she felt rushed. Riggleman Dep. 295:17-297:2.

Mr. William Grizzell, Third-Party Defendant Jerry Ours' expert witness, stated that to the best of his knowledge Ours' actions were within the scope of his duties as President of the GCBOE. *Expert Report of William Grizzell.* September 14, 2010. Riggleman has not produced any evidence that refutes that Kirk Wilson was the one who proposed this idea, and that Ours' actions were within the scope of employment as President of GCBOE.

### J. Ours' Use of Abusive Language

During an executive session of the April 21, 2009, GCBOE meeting, Ours told Riggleman to "go to hell." Furthermore Ours also told her "I will embarrass you a lot more than you did me," after Riggleman pointed out that the evaluation was delayed because of Ours' late filing of paperwork. It is important to note the Supreme Court's opinion in **Burlington N. & Santa Fe Ry. Co. v. White** 548 U.S. 53 (2006). In that case, the Court dealt with the retaliation provision of Title VII in the Civil Rights Act of 1964. The Act only covers those employer actions that would have been *materially adverse to a reasonable employee or applicant. **Id.*** The Court went on to emphasize that the judicial standards for sexual harassment must filter out complaints attacking ordinary tribulations of the work place, such as the sporadic use of abusive language, gender-related jokes and occasional teasing. ***Id.***

This Court recognizes that this case does not concern the Civil Rights Act of 1964, but it feels that the Supreme Court's discussion of filtering out ordinary tribulations

concerning retaliation is important to the case at hand. Both of these alleged comments were made during heated discussions as board members. If the Court was to interpret comments made in the heat of the moment while arguing during a board meeting as being harassment, intimidation, or retaliation, then our court system would be overrun with claims for hurt feelings. Riggleman testified that Ours had never acted in any way to embarrass her after the comments were made. Riggleman Dep. 304:7-16. Riggleman also testified that profanity was only used once, and that he only yelled at her on one occasion. Riggleman Dep. 317:1-14. These are situations that all employees experience at the work place. Riggleman sets forth no evidence that the comments were made with the intent of harassing, intimidating, or retaliating against her as a public official, or that they were outside the scope of employment.

### K. Violation of the West Virginia Sunshine Act

Riggleman alleges that Carr-Lambert accused her of violating the West Virginia Sunshine Act, which concerns open government proceedings. If three or more board members meet for any purpose without proper notice, such a meeting would be a violation of the West Virginia Sunshine Act. W. Va. Code § 6-9A-3 (1999). Carr-Lambert believed that Dottie Riggleman, Joyce Riggleman, and David Jones all violated the law when they signed Edwards' new contract on July 1, 2009. The three board members claim it was necessary to get the contract signed by the deadline of July 1, 2009. The fact that all three had signed the document on the same day can easily lead one to the conclusion that they had met and signed it together. Furthermore, Riggleman has admitted no evidence into the record that shows that Carr-Lambert accused them with the intention of harassing, intimidating, or retaliating against them. The fact that Carr-Lambert justifiably accused

17

them of violating § 6-9A-3 cannot be interpreted as a violation of § 61-5-27.

## L. Applicants for Director of Human Resources

Riggleman alleges that in July or August of 2009, Ours collected all of the applications for the position of Director of Human Resources, refused to distribute them to other board members, and represented to them that the board must hire Carr-Lambert because she was the only qualified applicant. However, deposition testimony paints a different picture. Edwards testified that the applications were sent to the GCBOE office, and that they were collected and stored in a locked filing cabinet by Sandy Hendrick. Tina Edwards Dep. 82:5-85:5. Edwards testified that she does not know how Ours came to know the identities of the interviewees, and that if Ours had asked her for their identities, she would have told him as well as any other board members. Tina Edwards Dep. 91:8-18 and 93:4-11. Riggleman has produced no evidence that it was inappropriate for Ours to know the identities of the interviewees. Furthermore, Riggleman has failed to put forth evidence showing Ours' intent was to harass, intimidate, or retaliate against Riggleman. Without such evidence, the motion for summary judgment should be granted.

## V. Conclusion

For the reasons stated above, the counterclaim and third-party defendants' Motions for Summary Judgment **[Docs. 219 and 223]** are hereby **GRANTED**, and the counterclaim and third-party complaint are **DISMISSED.**

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to all counsel of record in this

matter.

      **DATED:**    August 11, 2011.

*/s/ John Preston Bailey*
JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE